UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAURICE BOLLINI and
LISA BOLLINI,

    Plaintiffs,

Case No. 08-14608

v.

Honorable Paul D. Borman
United States District Judge

JOHNNY BOLDEN and MICHIGAN
STATE TROOPER C. BROWN and
MICHIGAN STATE TROOPER
A. MARTIN,

    Defendants.

_____/

OPINION AND ORDER
(1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 14);
(2) GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
(DKT. NO. 10); and
(3) ORDERING THE PARTIES TO SUBMIT EVIDENCE ON THE ISSUE OF DAMAGES

This matter is before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 14) and Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 10). Both parties have filed responses and replies and a hearing on the matter was held on April 7, 2010. For the reasons that follow, the Court DENIES Defendants' Motion for Summary Judgment, GRANTS Plaintiffs' Motion for Partial Summary Judgment and ORDERS the parties to submit evidence on the issue of damages.

Plaintiffs claim that Defendants violated their Fourth Amendment rights by entering their property without a judicially authorized warrant and seizing assets in satisfaction of an alleged tax

1

debt from a detached structure located in back of their home, pursuant to a Michigan Department of Treasury "tax warrant."  While Plaintiffs contest the underlying tax deficiency, they do not do so in this proceeding and challenge only the constitutionality of the seizure itself.[1]

Defendants respond that the seizure of assets pursuant to a Michigan Department of Treasury "tax warrant" did not constitute an unconstitutional search, and that, if there was a constitutional violation, Defendants are protected by the doctrine of qualified immunity because the law as to what constitutes a search under the Fourth Amendment and what constitutes the "curtilage" of the home is so imprecise that a reasonable officer would not have known that a search warrant may have been required.

**I.     BACKGROUND**

The Michigan Department of Treasury's tax claims against Plaintiff have resulted in continuous non-responses by Plaintiffs to communications from and visits by state tax agents.  The State has alleged that Mr. Bollini's company failed to satisfy the single business tax liabilities for his company, Hardwood Stairs & Millwork ("Hardwood"), for several years beginning in 1995. (Defs.'s Resp. to Plaintiffs' Motion for Summary Judgment, 3.)  The State allegedly forwarded several notices to Mr. Bollini and ultimately authorized Defendant Bolden to proceed with the seizure of assets pursuant to two "tax warrants" issued by the Michigan Department of Treasury - Tax Collection Enforcement Division, signed by the Director of the Michigan Financial Services Bureau.  (Pls.'s Mot. Ex. A, Deposition of Johnny Bolden, October 20, 2009 43-46, Exs. 5, 6.) These warrants were not judicially secured warrants.

---

[1] In their Complaint, Plaintiffs also include a count alleging Gross Negligence against all Defendants (Count II).  Plaintiffs did not address this argument in their briefs or at oral argument; the Court assumes that the parties have abandoned this theory of liability.

On July 15, 2008, Defendant tax agent Johnny Bolden, and Michigan State Troopers Martin and Brown, proceeded to the Bollini home at 4097 Carriage Hill Drive, Metamora, MI 48455. (Defs.'s Mot. Ex. 1, Deposition of Lisa Bollini, October 27, 2009 p. 56.) Both warrants listed this same address for Mr. Bollini, and his former company – the home address at 4097 Carriage Hill Drive, Metamora. (Pls.'s Mot. Ex. A, Bolden Dep. 43-46.) The Defendants arrived at the home at approximately 10:30 a.m. and first approached the attached garage, and knocked on the open entrance door to the garage. (Pls.'s Mot. Ex. A, Deposition of Johnny Bolden, October 20, 2009 p. 18-24.) Receiving no response, the Defendants entered the garage and walked toward the closed door from the garage to the home, where they encountered Plaintiff Lisa Bollini, who had seen the officers in the driveway and was exiting the door that leads from her home into the attached garage. (Defs.'s Mot. Ex. 1, Lisa Bollini Dep. 56-57, Pls.'s Mot. Ex. A, Bolden Dep. 30-31.)

Defendant Bolden informed Ms. Bollini that he was there to seize anything of value belonging to Mr. Bollini and that he planned to seize items that day. (Pls.'s Mot. Ex. A, Bolden Dep. 29.) Ms. Bollini informed the officers that she was going inside to call her lawyer at which point one of the officers, whom she alleges had his hand on his pistol or his taser, began to follow her toward the home. She told him he was not welcome in her home and she would be back out in a minute after she secured her children and her dogs in her home. (Defs.'s Mot. Ex. 1, Lisa Bollini Dep. 59-61.) The Trooper did not enter the home. Ms. Bollini returned shortly, with a phone, having called her attorney Jerry Abraham, and handed the phone to Defendant Bolden. (Pls.'s Mot. Ex. 3, Bolden Dep. 32.) Defendant Bolden testified that he told attorney Abraham to call Bolden's supervisor, and then proceeded with Defendants Brown and Martin[2] to a detached structure about

---

[2] The state group also included two other revenue agents, not named in the Complaint.

20 yards away, in back of the home at the end of Plaintiff's driveway.[3] (Pls.'s Mot. Ex. 3, Bolden Dep. 32; Pls.'s Mot. Exs. E, F, Photographs of home and back garage.)

Defendants entered the closed pole barn, inventoried and tagged the chosen items and changed the locks on the door before leaving Plaintiffs' property on July 15, 2008. (Pls.'s Mot. Ex. A, Bolden Dep. 37-39.) Defendant Bolden returned with a local moving company on or about July 31, 2008 and removed the items that were seized on July 15, 2008 without notifying anyone at the Bollini residence. (*Id*. at 39-41.) The seized items relating to Maurice Bolden and his woodworking business ultimately were sold at auction. Some of the seized items, later determined to be assets not subject to the tax judgment, including children's bikes and three-wheelers, children's golf clubs, pool cleaning equipment, a riding lawnmower, a weed-whacker and two snowmobiles, were returned to the Bollinis. (Pls.'s Mot. Ex. A, Bolden Dep. 55-57; Pls.'s Mot. Ex. A, Bolden Dep. Ex. 7.)

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the

---

[3] The Defendants refer to this structure as a "pole barn" and the Court will adopt this reference for purposes of this Opinion.

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than

a scintilla of evidence to survive summary judgment).

## III. ANALYSIS

Plaintiffs argue that the seizure of assets from their pole barn pursuant to the "tax warrant" was a violation of their Fourth Amendment right against unreasonable search and seizure. Defendants argue (1) that the seizure was not a search for constitutional purposes because Defendants were not looking for evidence of a crime; (2) that the Plaintiffs had no reasonable expectation of privacy in the pole barn because it was not a part of the curtilage of the home; and (3) assuming a constitutional violation did occur, Defendants are entitled to qualified immunity because neither (a) the law relating to seizing assets pursuant to a tax warrant, nor (b) the law relating to what defines the curtilage of a home were clearly defined.

### A. The Seizure of Plaintiffs' Assets Pursuant to the Tax Warrant[4]

Defendants argue that the seizure of Plaintiffs' assets "did not constitute a Fourth Amendment search as the intended purpose of the conduct was not to engage in a criminal prosecution or collect evidence for a potential criminal prosecution." (Defs. Mot. 13.) Defendants discuss a number of cases, such as *Widgren v. Maple Grove Twp.*, 429 F.3d 575 (6th Cir. 2006), which describe criminal investigations as generally more intrusive than administrative or regulatory investigations. *Cf. Taylor v. Michigan Dep't of Natural Resources*, 502 F.3d 452, 457 (6th Cir. 2006) (holding that a department of natural resources conservation officer's 5 minute inspection of

---

[4] While Defendants state in their Response to Plaintiffs' Motion for Summary Judgment that the items were simply "tagged" on July 15, 2008 and were not removed until a later date, they do not argue that the assets were not "seized" on July 15, 2008. Defendant Bolden stated in his deposition that the items were "seized "on July 15, 2008 when Defendants inventoried and tagged the items and changed the locks on Plaintiffs' pole barn. (Pls.'s Mot. Ex. A, Bolden Dep. 29, 39-40.) Thus, the Court does not distinguish between the seizure on July 15, 2008 and the removal on or about July 31, 2008, both of which were accomplished without Plaintiffs' consent, and without a warrant.

the exterior of a home located on a rural piece of property for suspected break-in did not constitute a search for purposes of the Fourth Amendment). *Widgren* and *Taylor* stand for the proposition that certain intrusions on to property, such as a zoning officer's inspection of the exterior of a home for tax assessment purposes, do not constitute a search under the two-part test enunciated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In the instant case, Defendants intruded into Plaintiffs' closed pole barn.

While Defendants do not misstate the law as set forth in *Widgren* and its progeny, they completely fail to address the fact that the Supreme Court has expressly ruled, in *G.M. Leasing Corp. v. United States,* 429 U.S. 338 (1977), that warrantless searches of private property in furtherance of tax collection are governed by the warrant protections of the Fourth Amendment. At oral argument on this matter, counsel for Defendants continued to insist, without addressing the Supreme Court's holding in *GM Leasing*, that *Widgren* and *Taylor* stand for the proposition that a search that does not have as its object the discovery of evidence of a crime is not entitled to the protections of the Fourth Amendment.

While both *Widgren* and *Taylor* note that a criminal investigation is generally more intrusive than an administrative search, and that this is a factor to consider in evaluating whether conduct constitutes a search under the Fourth Amendment, these cases do not hold, as Defendants imply, that a search must have as its purpose discovery of evidence of criminal activity to violate Fourth Amendment rights. Indeed, in *Taylor*, the court expressly noted that "not all non-criminal investigations are permissible," citing *Camara v. Municipal Court*, 387 U.S. 523, 530 (1967), where the Court held that administrative searches by municipal health inspectors constitute significant intrusions upon privacy interests protected by the Fourth Amendment and that judicially secured

warrants, supported by probable cause, were required to effect such searches. Similarly, the court in *Widgren* noted that a visual administrative search, in which "[n]othing is seized," constitutes "less of an intrusion on personal privacy and dignity than that which generally occurs in the course of criminal investigation." 429 F.3d at 584. The court did not, however, imply that such searches could never be invasive of Fourth Amendment rights and in fact distinguished *Camara*, *supra*, which involved physical entry into a structure as opposed to the naked-eye observations at issue in *Widgren*. *Id*. at 584 n. 3. Thus, to argue that the actions of Defendants in entering Plaintiff's closed pole barn and seizing assets from Plaintiffs' private property pursuant to a non-judicially authorized "tax warrant" were permissible because the officers were not seeking evidence of a crime, or that this search and seizure was analogous to an administrative or regulatory search for zoning or fencing violations, ignores longstanding legal precedent.

In *GM Leasing*, which is cited and discussed at length by Plaintiffs in their Motion for Partial Summary Judgment, and in their Response to Defendants' Motion for Summary Judgment, but not addressed or even mentioned by Defendants in their brief, the Supreme Court relied on the reasoning of its decision in *Camara, supra*, and discussed the Fourth Amendment implications of the very conduct at issue in this case – the seizure of assets pursuant to a valid judgment of tax liability. Distinguishing between the seizure of the taxpayer's vehicles, which were located on public streets or parking lots, and the taxpayer's books and records, which were located in his private office, the Court held that the former could be seized without a warrant but that the latter were clearly entitled to the warrant protections of the Fourth Amendment. Recognizing the broad exceptions to the warrant requirement that allow intrusions into privacy in furtherance of enforcement of the tax laws, the Court explained:

> This [allowable intrusion], however, relates to warrantless seizures rather than to warrantless searches. It is one thing to seize without a warrant property resting in an open areas or seizable by levy without an intrusion into privacy, and it is quite another thing to effect a warrantless seizure of property, even that owned by a corporation, situated on private premises to which access is not otherwise available for the seizing officer.
>
> \* \* \*
>
> The Respondents urge that the history of the common law in England and the laws in several States prior to the adoption of the Bill of Rights support the view that the Fourth Amendment was not intended to cover intrusions into privacy in the enforcement of the tax laws. We do not find in the cited materials anything approaching the clear evidence that would be required to create so great an exception to the Fourth Amendment's protections against warrantless intrusions into privacy.

429 U.S. at 354-355. The Court found no compelling evidence that would permit it to determine that "the warrant protections of the Fourth Amendment do not apply to invasions of privacy in furtherance of tax collection." *Id*. at 356. The Court concluded that the intrusion into the taxpayer's office for purposes of seizing books and records of assets without a judicially secured warrant was "in violation of the commands of the Fourth Amendment." *Id*. at 359.

The Sixth Circuit has expressly recognized the validity of the *GM Leasing* holding, distinguishing, as the Supreme Court did in *GM Leasing*, tax collection efforts that do not involve physical intrusions on to private property. In *Sachs v. United States*, 59 F. App'x 116, 119 (6th Cir. 2003) (unpublished), the court upheld the "seizure" of Plaintiff's securities, which were held in an investment account and were liquidated, and the funds forwarded to the IRS in satisfaction of the taxpayer's debt, because it did not involve the type of "physical intrusion" protected by the Fourth Amendment. *Id*. at 119. Recognizing the Supreme Court's decision in *GM Leasing*, the Sixth Circuit distinguished the case before it and refused to extend *GM Leasing* to cover a "constructive seizure" of the taxpayer's securities:

9

> The Supreme Court has held that a warrantless entry by IRS agents into a corporation's private offices violated the Fourth Amendment because a search of private property without proper consent is unreasonable unless it has been authorized by a valid search warrant. *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 352-53 (1977). In this case, the IRS agents never entered any private property of Sachs. . . . While the IRS does need a warrant to enter private premises in order to seize a delinquent taxpayer's property, the IRS does not need judicial authorization to simply seize property where it does not intrude upon privacy rights. *See id.* at 358.

59 F. App'x at 119. *See also Binder v. Redford Twp. Police Dep't*, 93 F. App'x 701, 703 (6th Cir. 2004) (unpublished) (recognizing that "no Supreme Court decision allows warrantless entry into areas of a home or business where the owner had a reasonable expectation of privacy simply because the police are in search of [assets].") (citing *GM Leasing, supra*).

Although Defendants in the instant case were state officials collecting a state tax liability, not federal agents collecting an IRS debt, the Court is unable to discern any different Fourth Amendment implications. The cases cited by Defendants involving conservation employees and tax assessors performing external inspections of homes for purposes of gathering information do not address the *GM Leasing* decision, which holds without question that the intrusion on to Plaintiffs' private property to seize assets in satisfaction of a valid tax judgment, without a judicially secured warrant, is a violation of Plaintiffs' Fourth Amendment rights. Defendants entry on to Plaintiffs' property to tag and seize Plaintiffs' assets in satisfaction of a tax debt constituted a search protected by the guarantees of the Fourth Amendment.

**B.    Plaintiffs' Privacy Interest in the "Pole barn" – the Curtilage of the Home**

Defendants argue alternatively that, even assuming they conducted a Fourth Amendment-protected search, the "pole barn" was not within the curtilage of Plaintiffs' home and, therefore, Plaintiffs have no protected privacy interest in that structure. The concept of "curtilage" was defined in *United States v. Dunn*, 480 U.S. 294 (1987):

> The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself. The concept plays a part, however, in interpreting the reach of the Fourth Amendment. . . . [In *Oliver v. United States*, 466 U.S. 170 (1984)], we recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. We identified the central component of this inquiry as whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life.
>
> Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

480 U.S. at 1139 (internal citations and quotation marks omitted). Cautioning against an overly-mechanical application of these four factors, the Court instructed that the "centrally relevant consideration" was "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id*. at 1140.

The Court in *Dunn* found first that the actual distance of the structure from the house itself – 60 yards – standing in isolation, did not support an inference of curtilage. Turning to the issue of the location of the barn on the property, the Court noted that it lay outside the fenced area surrounding the house, tending to militate against a finding of curtilage: "[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception of defining the curtilage-as the area around the home to which the activity of home life extends-is a familiar one easily understood from our daily experience." *Id*. at 302 (internal quotation marks and citation omitted). Turning to an inquiry of the nature of the use to which the property was put, the Court found the fact that enforcement officials possessed objective data indicating that the barn was being used for drug

production, including strong observable odors associated with the production of amphetamines, a significant indicator that the barn was not used for the intimate activities of domestic life. Finally, the Court found that the defendant had done little to protect the barn from those observing from an open field. *Id*. at 302. The Court concluded that the barn stood outside the curtilage of the home. *Id*. at 301.

The Sixth Circuit has followed *Dunn* and applied these factors in numerous cases to determine what constitutes the curtilage of a home. Typically, as in *Dunn*, the issue arises in the context of arguments for suppression of evidence discovered by officers within the "curtilage" of the home without a warrant. *See United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (finding that defendants had a reasonable expectation of privacy in their backyard, in which they gardened and hung their clothes to dry, which was intimately tied to the home itself); *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 599-600 (6th Cir. 1998) (finding that defendant had a reasonable expectation of privacy in a detached garage located 60 yards from the home which, although not inside a fence line, was within the natural boundaries of the home area demarcated by a river and a wooded area and as to which the only objective data indicating a use not connected with domestic life was a tip that the garage contained stolen goods). *See also United States v. Trickey*, 711 F.2d 56, 58-59 (6th Cir. 1983) (holding that defendant had a legitimate expectation of privacy in an outbuilding even though the building was put to business, and not personal, use, the relevant inquiry being privacy in "the premises").

In the instant case, the Court concludes that an evaluation of the *Dunn* factors militates in favor of a finding that the pole barn is within the curtilage of Plaintiffs' Home. Exhibits E and F of Plaintiffs' Motion depict the pole barn and its relation to the home, and suggest a strong inference

12

of the use to which Plaintiffs put this structure. First, the pole barn is no more than 20 yards from the principal residence. Although detached, proximity (closer by 40 yards than the structures in *Dunn* and *Jenkins*) weighs in favor of finding the pole barn to be within the home's curtilage. Second, the aerial photograph of Plaintiffs' property (Pls.'s Mot. Ex. A, Bolden Dep. Ex. 2) shows that Plaintiffs' home and the pole barn are both surrounded by same thick common woods which serve as a natural boundary defining the area of the home. *See Daughenbaugh, supra* at 600. Defendant Bolden's own sketch of the property (Pls.'s Mot. Ex. A, Bolden Dep. Ex. 1) indicates that the "pole barn" is connected to the driveway and directly across from the home and attached garage. The pole barn is located on the same driveway that is used to access the main home, it stands just behind a "Welcome" sign and a bird house and, it contains a basketball hoop, with an area of concrete just in front to facilitate play. As the Supreme Court suggested in *Dunn*, a most relevant consideration in defining curtilage is whether the activities of home life extend to the area in question.

The physical layout of Plaintiffs' property clearly indicates that "home life" extended to the pole barn, a conclusion further supported by the fact that inside the pole barn were many items intimately associated with the family activities, such as children's bicycles, pool cleaning equipment, three wheelers, snowmobiles and yard equipment – items ultimately returned after the seizure because they were not assets subject to the tax judgment. Thus, while Defendant Bolden testified in his deposition that officers had been informed that assets of the business could be found in the pole barn, and this is likely in that Plaintiff Bollini had closed down his business location for his woodworking business and likely stored woodworking machinery on his property, this does not defeat the reality that the use of the pole barn appears to have been significantly related to the home.

The final *Dunn* factor, steps taken by Plaintiffs to enclose the area, are supposed by the fact that the entire area in which Plaintiffs live is surrounded by thick woods, and the building was closed. Thus, the Court concludes that the pole barn was within the curtilage as defined by legal precedent.

### C. Availability of Qualified Immunity

Defendants argue that even if the seizure of assets from the Plaintiffs' pole barn was a violation of Plaintiffs' Fourth Amendment rights, they are protected by the doctrine of qualified immunity because neither the law on the constitutionality of warrantless searches to enforce tax liabilities nor the law defining curtilage was clearly defined. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In order to assert a violation of a "clearly established" right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "in the light of pre-existing law the unlawfulness must be apparent." *Id*. To prove that a right was clearly established, a claimant can draw from either Supreme Court precedent, Sixth Circuit precedent, or cases from other courts which "point unmistakably to the unconstitutionality of the conduct and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Mumford v. Zieba*, 4 F.3d 429, 432-33 (6th Cir.1993).

Defendants first claim that "no legal authority specifically existed such that it was sufficiently clear that a reasonable official would understand that executing the tax warrant was in

effect violating a constitutional right." (Defs.'s Mot. 16.) Defendants then state that Defendant Bolden has been executing tax warrants on behalf of the State of Michigan for over 15 years and has never been asked to secure a judicial warrant. (*Id*.) Therefore, they submit, there was a lack of clarity and specificity with respect to the parameters of discharging a State of Michigan tax warrant. (*Id*.) However, the *GM Leasing* decision was issued over 30 years ago and has been cited and relied upon by the Sixth Circuit at least as recently as 2003, *see Sachs, supra* and 2004, *see Binder, supra*. The cases relied upon by Defendants to justify their position that Defendants' conduct was not a "search" for purposes of the Fourth Amendment, i.e. cases involving tax assessors' and conservation officers' exterior regulatory inspections of homes, are a far cry factually from the seizure of assets accomplished by Defendants in the instant case. Defendants do not attempt to distinguish *GM Leasing,* or to explain why its holding does not apply with equal force to the actions of state officers seizing assets pursuant to a state tax warrant.

When asked at his deposition whether he was familiar with the Fourth Amendment of the United States Constitution, Defendant Bolden responded, no, he was not. (Pls.'s Mot. Ex. A, Bolden Dep. 37.) This is incredible! Indeed, it is shocking that in the day and age, that an officer of the State, charged with seizing assets from its citizens, is unaware of the right against unreasonable search and seizure guaranteed by the Fourth Amendment. When asked if there were any procedures that he was required to follow that should guide him when seizing property from private areas of individuals homes and businesses, Defendant Bolden stated that he could not remember. Supreme Court precedent, and Sixth Circuit interpretation of that precedent, are clear on the issue of the unconstitutionality of effecting a warrantless seizure of assets, situated in closed private premises, in furtherance of tax collection. This Court concludes that Defendants are not entitled to qualified

immunity for their failure to heed the law which clearly defined their conduct as a search and seizure under the Fourth Amendment.

Defendants argue that, even if the law defining their conduct as a "search" under the Fourth Amendment was clearly defined, the concept of the curtilage of Plaintiffs' home was not so defined and therefore they are entitled to qualified immunity on this issue. Defendants cite *Jenkins*, *supra*, for the proposition that the "concept of curtilage, unfortunately, evades precise definition." (Defs.'s Mot. 16.) That the concept is difficult to define does not excuse, however, totally ignoring the parameters which have been clearly set forth to aid in the endeavor of definition. There can be no question but that the Supreme Court *Dunn* factors are clearly established in the Sixth Circuit as controlling precedent for evaluating whether a particular structure is within the curtilage of an individual's home or private business. A purposeful , and not strained, application of the *Dunn* factors in the instant matter clearly leads to the conclusion that the pole barn, which sported the family basketball hoop, and was contiguous to the home and the driveway and which contained many items intimately connected with the family life, was an area in which the Plaintiffs had a reasonable expectation of privacy. There can be no question that a reasonable officer, standing in Plaintiffs' driveway and viewing the scene depicted in the photographs attached to Plaintiffs' motion, would conclude that the activities of this family extended to this structure, which was nestled within the same thick wooded area as Plaintiffs' residence and garage, located but 20 yards away.

Thus, the Court rejects the argument that Defendants' actions in seizing assets from Plaintiffs' pole barn without a judicially authorized warrant, in violation of Plaintiffs' Fourth Amendment rights, should nonetheless be excused on the argument that these rights were not clearly

defined. *See Gould v. Symons*, No. 01-10026, 2003 WL 21877726 at * 5-6 (E.D. Mich. April 25, 2003) (unpublished) (recognizing that *GM Leasing* and *Oliver* clearly define the rule of law that, absent exigent circumstances, government officials must have a warrant to enter a private occupied residence or its curtilage - in that case to remove a nuisance).

**IV.    CONCLUSION**

The Court DENIES Defendants' Motion for Summary Judgment (Dkt. No. 14) and GRANTS Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 10) and ORDERS the parties, beginning with the Plaintiff, to submit evidence on the issue of damages.

IT IS SO ORDERED.

        s/Paul D. Borman
        PAUL D. BORMAN
        UNITED STATES DISTRICT JUDGE

Dated: April 14, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 14, 2010.

        s/Denise Goodine
        Case Manager